No. 23-3550

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN AKINS; JACON ARICIU; ANTHONY BELL;
BRIDGETT BURK; TERRY FISCHER; TYLER KING;
JORDAN O'HARA; CHERYL SENKO,

*Plaintiffs-Appellees*,

SARAH FELDMAN; JILL MAHANEY,

*Objectors-Appellants*,

v.

FACEBOOK, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:18-md-02843-VC | The Honorable Vince Chhabria

## APPELLEE FACEBOOK, INC.'S ANSWERING BRIEF

Joshua S. Lipshutz
Aaron Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

Martie Kutscher Clark
Patrick Reischl
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, California 94301
(650) 849-5300

Christopher Chorba
Timothy W. Loose
Daniel R. Adler
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, Facebook, Inc., now known as Meta Platforms, Inc., discloses that it is a publicly traded company and that no parent corporation or publicly owned corporation owns 10% or more of its stock.

Dated: August 19, 2024        */s/ Joshua S. Lipshutz*
                           Joshua S. Lipshutz

                       *Counsel for Facebook, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................... 1

STATEMENT OF JURISDICTION ........................................... 4

STATEMENT OF THE ISSUES ............................................... 5

STATEMENT OF THE CASE ................................................... 5

SUMMARY OF ARGUMENT ................................................. 19

STANDARD OF REVIEW ...................................................... 22

ARGUMENT .......................................................................... 23

    I.    The district court did not abuse its discretion in
approving a settlement that provides substantial relief
to the class. ................................................................. 23

    II.    The objectors' challenges to the settlement are
meritless. .................................................................... 31

        A.    The district court did not abuse its discretion in
overruling objections to the settlement relief. .............. 31

        B.    The settlement is allocated equitably. ......................... 44

        C.    The district court's award of attorneys' fees is not
a basis for reversal of the settlement approval. .......... 54

CONCLUSION ...................................................................... 57

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Apple Inc. Device Performance Litig.,*
50 F.4th 769 (9th Cir. 2022) ......................................................45, 50

*In re Blue Cross Blue Shield Antitrust Litig.,*
85 F.4th 1070 (11th Cir. 2023) ...........................................................54

*In re Bluetooth Headset Prods. Liab. Litig.,*
654 F.3d 935 (9th Cir. 2011)........................................................19, 29

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021)................................................15, 29, 30

*Campbell v. Facebook, Inc.,*
951 F.3d 1106 (9th Cir. 2020)......................................................22, 23

*Churchill Vill., LLC v. Gen. Elec.,*
361 F.3d 566 (9th Cir. 2004)...............................................................14

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992)......................................................16, 44

*Dikeman v. Progressive Express Ins. Co.,*
312 F. App'x 168 (11th Cir. 2008) ......................................................43

*DIRECTV, Inc. v. Brown,*
371 F.3d 814 (11th Cir. 2004)..............................................................42

*Dorris v. Absher,*
179 F.3d 420 (6th Cir. 1999)................................................................42

*In re Easysaver Rewards Litig.,*
906 F.3d 747 (9th Cir. 2018)........................................................55, 56

*In re Facebook, Inc. Internet Tracking Litig.,*
2024 WL 700985 (9th Cir. Feb. 21, 2024) ................. 1, 2, 21, 35, 36, 41

*Fraley v. Batman,*
638 F. App'x 594 (9th Cir. 2016) ............................................21, 41, 44

*Glass v. UBS Fin. Servs., Inc.*,
  331 F. App'x 452 (9th Cir. 2009) ...................................... 53

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................ 23, 52, 54

*Kang v. Fyson*,
  2022 WL 6943174 (9th Cir. Oct. 12, 2022) ............... 51, 52, 53

*Kim v. Allison*,
  8 F.4th 1170 (9th Cir. 2021) ........................................ 29

*Lane v. Facebook, Inc.*,
  696 F.3d 811, 823 (9th Cir. 2012) ........... 1, 16, 20, 35, 42, 43

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ...................................... 37

*In re Lumber Liquidators Chinese-Manufactured Flooring
  Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
  952 F.3d 471 (4th Cir. 2020) .................................... 55, 56

*Nalley v. Nalley*,
  53 F.3d 649 (4th Cir. 1995) ........................................ 42

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ...................................... 37

*Radcliffe v. Hernandez*,
  794 F. App'x 605 (9th Cir. 2019) ................................... 50

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002) .............................. 33, 34, 36

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) .............. 1, 20, 22, 23, 34, 37, 43, 56

*Russell v. Kohl's Dep't Stores, Inc.*,
  755 F. App'x 605 (9th Cir. 2018) ................................... 55

*SmileDirectClub, LLC v. Tippins*,
  31 F.4th 1110 (9th Cir. 2022) ...................................... 39

iv

*Wakefield v. ViSalus, Inc.*,
    51 F.4th 1109 (9th Cir. 2022) ........................................................27, 40

## Statutes

15 U.S.C. § 15(a) ...............................................................................34

18 U.S.C. § 2520(c)(2) .......................................................................42

18 U.S.C. § 2702(b) ...........................................................................26

18 U.S.C. § 2707(c).......................................................................41, 42

18 U.S.C. § 2710(a)(3)........................................................................25

18 U.S.C. § 2710(c)(2) ..................................................................41, 42

## Rules

Fed. R. Civ. P. 23(e)(2)..................................................................19, 23

Fed. R. Civ. P. 23(e)(2)(D) ................................................................44

## Other Authorities

Form 10-K (Feb. 2, 2024), https://investor.fb.com/financials/
    sec-filings-details/default.aspx?FilingId=17229405 ...........................40

4 William B. Rubenstein, *Newberg & Rubenstein on Class
    Actions* § 13:56 (6th ed. 2024)..........................................................45

## INTRODUCTION

Sarah Feldman and Jill Mahaney, the lone remaining objectors to the $725 million settlement before the Court, contend the settlement amount is not enough because it is a fraction of the maximum statutory damages the class could have hypothetically recovered if it had managed to clear the numerous legal and practical hurdles standing in the way of a final judgment. This Court has rejected that very argument several times over, including earlier this year in another of Feldman's appeals. *In re Facebook, Inc. Internet Tracking Litig.*, 2024 WL 700985 (9th Cir. Feb. 21, 2024); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). In fact, the objectors moved to stay this appeal pending this Court's resolution of *Facebook Internet Tracking* because the two cases presented the same issue. Mot. to Stay at 2, No. 23-3550, Dkt. 4.1. In that motion, the objectors told the Court that their challenge to this settlement "would likely be eliminated" if the Court affirmed the settlement in *Facebook Internet Tracking*. *Id.* They were right. Yet the objectors continue to rehash the same argument here. The Court should reject it again.

1

The objectors' theory is that the value of class settlements should turn almost entirely on claims that carry statutory damages. According to the objectors, in considering a class settlement, a district court must calculate the total potential statutory damages that would be available if statutory violations were proven for all class members (here, $878 billion) and multiply that hypothetical amount by the plaintiffs' likelihood of success (here, the objectors presume a 1% chance of victory). If the proposed settlement doesn't exceed the result of this calculation (here, $8.78 billion), the objectors believe the settlement must be rejected.

This Court has repeatedly explained that the decision whether to approve a settlement comes down not to a mathematical formula, but instead to whether the settlement is fair and reasonable in light of all the relevant facts, including any obstacles in the plaintiffs' way. The Court has also made clear that it makes no sense to set settlement benchmarks based on maximum statutory damages because, in most class actions, any award close to those figures would violate due process. *E.g.*, *Facebook Internet Tracking*, 2024 WL 700985, at *1. The objectors never explain why a purely theoretical and plainly unconstitutional award should be the yardstick used to measure this—or any other—settlement.

2

The objectors complain about not just the size of the settlement, but also how it is allocated across class members. The objectors argue that class members who signed up for Facebook before 2010 should get more money than those who signed up later. They contend that later users consented to the data-sharing practices challenged in this case and that early users did not consent and should therefore receive more money. That contention is factually and legally wrong. On the facts, the objectors rely on the district court's motion-to-dismiss order, which held that users who signed up for Facebook in 2009 or later consented to the types of data sharing at the heart of the case. But that ruling was based on the information before the court on Facebook's motion to dismiss, and did not include Facebook's pre-2009 disclosures, which disclosed the same practices. The district court acknowledged that Facebook could raise its consent defense for users who signed up earlier at summary judgment.

The objectors' allocation argument is also legally wrong. Settlement allocation plans need only be fair. District courts do not have to adjust allocation plans for the strengths and weaknesses of every claim and defense as to each class member—which would be impossible in a case like this one, with hundreds of millions of class members, dozens of

claims, and scores of legitimate defenses. The plan the district court approved here is fair; it ties payouts to how long each class member had an active Facebook account, which generally awards early users a greater share of the settlement. While the objectors believe they have a better way to distribute settlement funds and award early users more money, that sort of quibble does not establish an abuse of discretion.

Finally, the objectors complain that the district court approved too high a fee award for plaintiffs' counsel. Facebook has no position on that issue. But regardless of this Court's decision with respect to attorneys' fees, the Court should approve the settlement. This is a non-reversionary, common-fund settlement. If the Court affirms the settlement approval but reverses the fee award, the class will get more, but the amount of the settlement will not change.

The $725 million settlement before the Court is more than fair, adequate, and reasonable, and the district court did not abuse its discretion in approving it. The Court should affirm the judgment.

## STATEMENT OF JURISDICTION

Facebook agrees with the objectors' statement of jurisdiction.

## STATEMENT OF THE ISSUES

Did the district court abuse its discretion in approving the $725 million settlement?

## STATEMENT OF THE CASE

### I. The district court narrowed plaintiffs' claims regarding alleged misuse of Facebook user data.

In March 2018, there was widespread press coverage of the allegedly improper use of Facebook user data by Aleksandr Kogan, a Cambridge University researcher, and Cambridge Analytica, a British political consulting firm. In 2013, Kogan had created a personality quiz app on Facebook, and some Facebook users had opted to share their data with the app along with data from their Facebook friends (if sharing was permitted by both users' privacy settings). Kogan sold the data to Cambridge Analytica, in violation of Facebook policies. After news outlets publicized Cambridge Analytica's alleged misuse of the data it purchased, dozens of suits were filed against Facebook. These lawsuits generally alleged that Facebook inappropriately permitted the sharing of user data with third parties and inadequately monitored how third parties used Facebook data. Many of the Cambridge Analytica-related

suits were transferred to a multidistrict litigation in the Northern District of California and litigated as a consolidated class action.

After two rounds of motion-to-dismiss briefing and hearings, with intervening amendments to the complaint, the district court partially granted Facebook's motion to dismiss. 2-ER-24–94. According to the district court, the complaint contained "disparate and vague" allegations, and "at times it seem[ed] plaintiffs sought to identify anything Facebook has ever been reported to have done wrong and then made sure to sprinkle in at least a few allegations about it." 2-ER-28–29.

For most users, the district court dismissed, among other things, claims arising from plaintiffs' core theory of liability: that Facebook did not disclose to users that an early version of its platform allowed apps (like Kogan's) to request data about users through their friends who installed the apps, provided the friends' privacy settings permitted such requests. 2-ER-48–50. This practice was called "friend sharing." The district court considered a sample of Facebook policies from August 2009 and later, which were incorporated by reference in the complaint, and held that, as early as 2009, Facebook disclosed friend sharing to its users and users consented to it. 2-ER-45–49. The court did not consider

Facebook's policies from before August 2009 because they were not incorporated by reference in the complaint. 2-ER-46 n.12. For users who joined Facebook before 2009, the court therefore could not "conclude as a matter of law," based on the documents incorporated by reference, that they consented to the friend-sharing policy. 2-ER-50. But the court acknowledged that Facebook could raise this defense again at summary judgment. 2-ER-50 n.14; *see* 1-ER-9.

Facebook raised various other arguments in its motion to dismiss, including that plaintiffs' claims were untimely because users had been on notice of the challenged policies long before their claims were filed in 2018. The district court declined to address Facebook's statute-of-limitations argument at the pleadings stage but acknowledged that the claims may well be timed-barred and that Facebook could renew its statute-of-limitations defense at summary judgment or trial. 2-ER-45–46 n.10.

After the court narrowed the case through its partial dismissal order, the parties entered into discovery regarding plaintiffs' remaining claims. Discovery was complex and extensive. Over the course of three years, Facebook produced nearly six million pages of documents and

7

hundreds of pages of interrogatory responses. 2-ER-113. Plaintiffs took dozens of depositions from current and former Facebook employees, including nearly 100 hours of Rule 30(b)(6) depositions. 2-ER-113. And Facebook deposed each of the eight named plaintiffs, who produced over 20,000 pages of documents themselves. 2-ER-113–14. Then-Magistrate Judge Corley conducted more than twenty discovery hearings and issued more than a dozen discovery orders. 2-ER-113. The parties engaged in seventeen discovery mediation sessions and resolved dozens of substantive discovery issues through a court-appointed special master. 2-ER-113.

## II. The parties negotiate a settlement after extensive, arm's-length negotiations overseen by experienced mediators.

Two years into discovery, in June 2021, the parties retained former Magistrate Judge Jay Gandhi as a mediator. 2-ER-115. Mediation discussions lasted more than a year (during which discovery continued) and involved extensive mediation statements, written responses to Judge Gandhi's questions, and several remote and in-person mediation sessions. 2-ER-115. The parties reached a settlement agreement in principle just over a year later, in August 2022. 2-ER-115. In finalizing the written settlement agreement, the parties worked through many

remaining issues with District Judge Corley, 2-ER-116, who had resolved numerous discovery disputes in the case in her former position as a magistrate judge and had extensive familiarity with the issues and the parties, 2-ER-116.

The parties finalized and executed the settlement agreement in December 2022. 2-ER-116. The parties agreed to a non-reversionary settlement of $725 million. *See* 2-ER-143. After extensive negotiations, the parties agreed to allocate the settlement fund among class members according to the number of months each member had maintained an active Facebook account during the class period. 2-ER-143–44. The parties, as well as an expert in analyzing settlement allocation plans, determined that this method was the fairest option for two reasons. First, there was no evidence that could be used to precisely quantify each class member's alleged damages from the purported invasion of privacy. 2-ER-144; 2-FSER-313–15 ¶¶ 17–18, 21. Second, everyone agreed that the longer users were on the platform, the higher the chance that third parties may have accessed their data. 2-ER-143–44; 2-FSER-313–15 ¶¶ 17–18, 21.

9

The district court carefully scrutinized the parties' proposed settlement and notice plan. In advance of the preliminary approval hearing, the court suggested several edits to the settlement website, class notice, and procedures for opting out and objecting. Dkt. 1109. The court then conducted a thorough preliminary approval hearing. It questioned counsel about, among other things, whether the settlement should include injunctive relief as well as monetary relief, and whether the release of claims would affect certain pending actions brought by state attorneys general. 1-FSER-109, 117–25. In March 2023, the district court issued a written order granting preliminary approval of the settlement and of the notice to the proposed class. 2-ER-168–75.

## III. Class members overwhelmingly support the settlement.

More than 93% of the estimated 253 million class members received notice of the settlement through one of the "largest, most voluminous" notification programs ever undertaken. 1-FSER-99; 1-ER-4; 2-ER-259. Class members' response to the settlement was overwhelmingly positive. Over 28 million claims were filed. 1-FSER-15. At the time of final approval, the settlement administrator had validated nearly 18 million claims. 1-FSER-15–16. About 20,000 people opted out of the settlement

10

(though about 4,000 of those also filed claims), representing just 0.008% of the class. 1-FSER-54. Fewer than 100 class members (0.00003% of the class) filed objections, 1-FSER-3, including Sarah Feldman and Jill Mahaney, who are now the only objectors continuing to challenge the settlement.

In the district court, Feldman and Mahaney objected to the settlement for three reasons. First, they argued the settlement relief was inadequate in comparison to the $625 billion in statutory damages that theoretically could have been available under the Video Privacy Protection Act ("VPPA") if all class members had fully succeeded on that claim. 2-ER-282–95; *see also* 1-FSER-16–22. They acknowledged that a $625 billion recovery—the maximum statutory damages under the VPPA ($2,500) multiplied by 253 million estimated class members—"would be unlikely to be upheld" because of "due process limitations," but they contended that the $725 million settlement "represents simply too small a percentage of the potential statutory damages" available. 1-FSER-17; *see* 2-ER-285–90. Feldman and Mahaney asserted that any settlement less than the "likely litigation value," which they pegged at $6.25 billion, would be inadequate and unreasonable. 2-ER-288.

11

Feldman and Mahaney did not ask the district court to consider potential statutory damages under the Stored Communications Act ("SCA") when evaluating the settlement. *See* 2-ER-285–92. They now ask this Court to do so, which they say raises the maximum statutory damages in this case to a theoretical $878 billion. Opening Br. 1, 8, 12–21.

Second, Feldman and Mahaney objected to the allocation of the settlement among class members. 2-ER-291–92. Although the district court held that Facebook disclosed friend sharing in 2009, 2-ER-50, the objectors argued that it "appears" that "the actual date of the public disclosure was in 2010, not 2009," 2-ER-291 n.6. According to the objectors, class members who joined Facebook before 2010 therefore "have much stronger claims that should be more generously compensated." 2-ER-291. On appeal, Feldman and Mahaney assert that the district court should have provided double credit for each month a Facebook user was on the platform "prior to 2010." Opening Br. 26. The objectors did not contest plaintiffs' adequacy of representation as to pre-2010 users or the typicality of plaintiffs' claims.

12

Third, Feldman and Mahaney objected to class counsel's requested fees ($181 million, or 25% of the settlement fund), contending they should be reduced to no more than $72.5 million, or 10% of the settlement fund. 2-ER-292–94.

## IV. The district court grants final approval of the settlement and awards attorneys' fees.

The district court conducted a thorough fairness hearing, discussing the settlement with class counsel, counsel for Facebook, and all appearing objectors and their counsel. 1-FSER-6–57.

The court specifically addressed Feldman and Mahaney's objections with their counsel. 2-FSER-16–22. As for the settlement amount, the district court stated that an award of the maximum possible statutory damages was not "realistic": "I can't imagine that would happen in this case." 1-FSER-17–18. Even the objectors "concede[d]" that a verdict awarding full statutory damages "would be unlikely to be upheld" in light of "due process limitations." 1-FSER-17.

And as for the allocation of the settlement, the court explained that early users did not necessarily have a stronger claim; the court's motion-to-dismiss order was "just [at] the pleadings stage," and Facebook "presumably would have had consent defenses" for earlier users that the

13

court would have considered at summary judgment. 1-FSER-20–21. The court emphasized that the settlement does not have to "achieve perfection"—especially for the "massive number" of class members over the lengthy class period. 1-FSER-21. Plaintiffs, for their part, emphasized that Facebook's consent defense for early users would have had "considerable force" at summary judgment in light of the disclosures in its pre-2009 policies, which were not considered at the motion-to-dismiss stage. 1-FSER-87; 1-FSER-35–36.

The district court granted final approval of the settlement in a written order. 1-ER-2. The court first addressed the requirements for notice to the class. The court held the class received the "best notice practicable under the circumstances," and that the notice was sufficiently readable and detailed to alert the class. 1-ER-3–4 (citing *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

The court next addressed the requirements for class certification. It reiterated its findings that the settlement class satisfied the Rule 23(a) and (b)(3) requirements for certification, including numerosity, commonality, typicality, predominance, and superiority. 1-ER-4. The court also confirmed that the plaintiffs and class counsel "fairly and

14

adequately represented" the interests of the class.  1-ER-5.  Finally, it overruled the objections to class certification, specifically finding that subclasses were unnecessary to resolve intra-class conflicts.  1-ER-4.

Proceeding to analyze the Rule 23(e)(2) factors for settlement approval, the court recognized this was a settlement "reached prior to a ruling on class certification," and therefore subject to "heightened scrutiny."  1-ER-5.  The court then carefully considered the factors for settlement approval:

- The court held that plaintiffs and class counsel had "ably protected and furthered" the interests of the class.  1-ER-5. These efforts supported the requested attorneys' fees for class counsel.  1-ER-5, 10–11.

- The settlement was reached through arm's-length negotiations, and the court found no evidence of fraud or collusion.  1-ER-5.  The court specifically cited the "critical" roles of Judge Corley and Judge Gandhi in brokering a fair settlement, as well as its own independent assessment of the settlement.  1-ER-6 (citing *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021)).

15

- The court found the settlement provides "excellent relief" for the class considering "the range of reasonable possible recoveries." 1-ER-6 (citing *Lane v. Facebook, Inc.*, 696 F.3d 811, 820 (9th Cir. 2012); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). The court noted the parties had engaged in thorough discovery and "developed an extensive factual record with which to evaluate their chances of success," and that "further litigation would likely be complex, expensive, and lengthy." 1-ER-6. Considering the costs, risks, and delay of further litigation, the court ruled the $725 million settlement provides "substantial benefits" to the class. 1-ER-6. The settlement would provide an estimated average of $30 to those class members who made valid claims by the deadline in August 2023, subject to a final tallying of costs and validation of claims. 1-FSER-15; 1-ER-13.

- Finally, the court held the proposed method of distributing funds to the class is "fair and adequate" and treats class members equitably. 1-ER-7.

16

In light of those specific findings, the court concluded the settlement is "fair, reasonable, and adequate and in the best interests" of the class. 1-ER-5.

The court then overruled the objections to the settlement. As for Feldman and Mahaney's objection to the settlement amount, the court recognized the "recovery theoretically available under the VPPA is very large," but explained that the objectors had failed to consider the "significant legal risks and potential difficulties of proof" plaintiffs admitted they would face if litigation continued. 1-ER-7. It held the litigation risks, including Facebook's due-process arguments, were "reasonably accounted for" in the settlement amount and resulted in a "highly favorable" outcome for the class. 1-ER-7.

Next, the court addressed the proposed plan for allocating the settlement relief among claimants. The court acknowledged that it would be "nearly impossible to determine" a precise measure of third parties' access to user data. 1-ER-8. But the court found the parties had proposed a reasonable proxy for that measure—the number of months a user had an activated Facebook account. 1-ER-8. An allocation plan based on that proxy is "fair, reasonable, and adequate." 1-ER-8.

17

The court disagreed with Feldman and Mahaney's contention that early Facebook members had stronger claims than later users that warranted giving early users a disproportionate share of the settlement. The court explained that the objectors had misunderstood its ruling that Facebook's consent defense applied only to users who joined Facebook in 2009 and later. 1-ER-9. That ruling was based on the information before the court on Facebook's motion to dismiss, which did not include Facebook's pre-2009 disclosures. 1-ER-9. The court emphasized that Facebook could still have pressed its consent defense for pre-2009 users at summary judgment or trial. 1-ER-9.

Finally, the court granted plaintiffs' counsel's request for attorneys' fees. The court explained that awarding attorneys' fees equal to 25% of the settlement fund would not result in a windfall for class counsel because the lodestar cross-check yielded a 1.99 multiplier, which the court deemed reasonable "in light of the risks of the litigation, the benefits provided by the Settlement, and the work performed by Class Counsel." 1-ER-15–17.

18

The district court issued its orders granting final settlement approval and awarding attorneys' fees in October 2023.  1-ER-2, 14.  The objectors timely appealed.  3-ER-309–11.

## SUMMARY OF ARGUMENT

**I.**     The district court reasonably decided that a proposed settlement payment of $725 million is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  That amount is extremely favorable to the class members.  Plaintiffs faced a long and difficult road to winning *any* relief for the class, much less the hundreds of millions of dollars they stand to gain now.  Among many other problems, the district court or a jury might have concluded that all class members consented to the forms of data sharing at issue, that the claims were time-barred (as they were brought years after Facebook disclosed the very practices over which plaintiffs sued), and that Facebook could not control the actions of all third parties on its platform (and in fact disclaimed any such control).

The few class members who objected could not rely on any of the "warning signs" that have derailed other settlements on appeal.  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). The settlement agreement forbids reversion; any money that goes

unclaimed or unawarded to plaintiffs' lawyers will go to class members, not back to Facebook. There is no "clear sailing" agreement; Facebook reserved the right to oppose any motion for attorneys' fees. And the class, not plaintiffs' lawyers, will receive the lion's share of the settlement.

In short, this is a deal that was negotiated in good faith and appropriately approved after careful review by the district court.

**II.** The objectors challenge the district court's approval order in three ways. The district court did not abuse its discretion in overruling them.

**A.** The objectors assert that the district court should not have approved a settlement any smaller than $8.78 billion—1% of the hypothetical maximum statutory damages the class could have recovered if they successfully showed both a VPPA and SCA violation for all class members. Opening Br. 19. This Court has already rejected invitations— including Feldman's identical challenge to another Facebook settlement in this Court earlier this year—to adopt mathematical formulas for evaluating settlements and to use theoretical statutory damage awards as settlement benchmarks. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir.

20

2012). The $878 billion yardstick the objectors propose is also absurd; a damages award of that amount would be unconstitutional, and cannot reasonably be used to measure the settlement's fairness. *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016). Ultimately, Feldman's objections to the settlement amount are—in her own words—"identical" to her objections in another data-privacy settlement involving potential statutory damages against Facebook, which this Court rejected. 1-FSER-17; *see In re Facebook, Inc. Internet Tracking Litig.*, 2024 WL 700985, at *1 (9th Cir. Feb. 21, 2024). For this reason, the objectors previously recognized that if this Court affirmed the settlement in *Facebook Internet Tracking*, then their challenge to this settlement "would likely be eliminated." Mot. to Stay at 2, No. 23-3550, Dkt. 4.1. They were right.

**B.** The objectors assert that those who joined Facebook before 2010 have "uniquely strong" claims because the district court did not dismiss them at the pleadings stage under Facebook's consent defense. Opening Br. 23. According to the objectors, the district court therefore erred in approving an allocation plan that does not provide *double* credit to class members for each month they were on Facebook before 2010.

21

Opening Br. 23.  The objectors are wrong.  It was not an abuse of discretion for the district court to use a reasonable proxy for the value of each class member's claim—time as a Facebook user—to apportion the settlement.  In fact, in most cases, that approach provides exactly what the objectors seek—greater recovery to class members who joined Facebook earlier.  Moreover, class members who joined before 2010 did not have "uniquely strong" claims:  They would have faced Facebook's same consent defense at summary judgment or trial.

**C.**     Regardless of whether the Court approves the fee award, the Court should affirm the district court's approval of the settlement. *Rodriguez*, 563 F.3d at 968.  The settlement was not conditioned on approval of attorneys' fees.  And affirming the settlement while remanding for further proceedings on fees would not prejudice the objectors or the class:  If the fees are reduced, the class would receive the difference.

## STANDARD OF REVIEW

Review of a district court's decision to approve a class action settlement is "extremely limited."  *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020).  This Court has "repeatedly stated that the

decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [wa]s 'exposed to the litigants, and their strategies, positions and proof.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

"Parties seeking to overturn the settlement approval must make a 'strong showing' that the district court clearly abused its discretion." *Campbell*, 951 F.3d at 1121. Under that standard, a reviewing court "'will affirm if the district judge applies the proper legal standard and his or her findings of fact are not clearly erroneous.'" *Rodriguez*, 563 F.3d at 963.

## ARGUMENT

### I. The district court did not abuse its discretion in approving a settlement that provides substantial relief to the class.

Because class settlements resolve the potential claims of absent class members, district courts must ensure that they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To do that, district courts must "balance a number of factors" in deciding whether to approve settlements. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Here, the district court correctly decided that all the relevant factors favor the proposed settlement, including (1) the weaknesses of

23

plaintiffs' case, (2) the risks of further litigation, (3) the amount offered in settlement, and (4) the reaction of the class to the proposed settlement.

**1. Weaknesses.** Both "Class Counsel and the Court . . . carefully evaluated th[e] strengths and weaknesses" of plaintiffs' case, and plaintiffs "acknowledge[d] that they would face significant legal risks and potential difficulties of proof in this case if the litigation were to continue." 1-ER-6–7 (citing 2-ER-125–42); *see also* 1-FSER-158–71. Plaintiffs confessed they faced an uncertain and uphill battle even to get to trial, much less win it. Consider five of the many hurdles in their way.

*First*, plaintiffs acknowledged that there was a significant risk a district court or a jury would have decided that their claims were time-barred because users were on notice of the data-sharing practices at issue in this case long before plaintiffs sued in 2018. 2-ER-45 n.10; 2-ER-129; 1-FSER-160, 163, 166. Plaintiffs alleged users discovered those practices thanks to news coverage in 2018, Dkt. 491 at 251, but Facebook disclosed them in its user-facing policies, to which all users must consent, starting in 2007, and the longest statute of limitations is four years. 1-FSER-160. Plaintiffs also were put on notice by, among other things, the publication

of a 2012 FTC consent order addressing "similar information-sharing practices." 2-ER-45 n.10.

*Second*, plaintiffs conceded there was a "significant risk" that they would not prevail on their VPPA claim. 2-ER-130. Plaintiffs' VPPA theory was that when users liked or commented on videos posted to Facebook, Facebook improperly "disclose[d]" users' "personally identifiable information"—i.e., information that "identifies a person as having requested or obtained specific video materials or services"—to third parties without consent because other users could see these likes and comments. 18 U.S.C. § 2710(a)(3), (b)(1). But Facebook's privacy policy explains that the user who posts a video "gets to select" the audience for the video and any likes or comments on it. 2-ER-84. It was abundantly obvious that users could see others' interactions on videos they viewed, and there was no evidence showing that any user's interactions with video content were ever shared without their consent. *See* 1-FSER-167–68. The district court found that the objectors ignored "the risks involved in proceeding with the [VPPA] claim," and that plaintiffs conceded they faced "significant legal risks and potential

difficulties of proof" on this claim. 1-ER-7; *see also* 1-FSER-168 (explaining additional obstacles to VPPA claim).

*Third*, there was a significant risk that plaintiffs' SCA claim would be barred by the SCA's exception for single-party consent. Plaintiffs' SCA claim depended on allegations that users did not sufficiently consent to third-party access to communications with their friends. Dkt. 491 ¶¶ 357–63, 799–800. But the SCA requires only one party to consent to sharing electronic communications, and here, at least one person—the user, his or her friend, or both—consented to every instance of sharing that plaintiffs challenge. 2-ER-132–33 (citing 18 U.S.C. § 2702(b)). Because there is no evidence that Facebook shared communications with third parties without the consent of *any* party to the communication, plaintiffs would have had difficulty proving any SCA violation.

*Fourth*, although plaintiffs theorized that Facebook had breached its promise to users by inadequately enforcing its data-use policies against third parties, those same policies made no promise that Facebook would enforce them or that third parties would follow them—and expressly disclaimed any such promise. 1-FSER-164–65. That was

26

enough for other courts to reject similar breach-of-contract claims asserted against Facebook in other cases.  1-FSER-164–65.

*Fifth*, due process would have capped the amount plaintiffs could have recovered from Facebook.  This Court, for example, recently vacated a $925 million award of statutory damages and remanded to the district court to decide whether an award that large violated due process, and plaintiffs acknowledged that "[t]he same due-process concerns could be present here."  2-ER-131 (citing *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022)).

These are just a few of the many obstacles plaintiffs faced on the long road to a judgment in their favor.

**2.  Risks.**  The district court explained that "further litigation would likely be complex, expensive, and lengthy."  1-ER-6.  Facebook would continue to press significant defenses—including consent, the statute of limitations, and the lack of evidence to support the plaintiffs' theories—through class certification, summary judgment, and trial.  1-ER-6, 9; *see also, e.g.*, 1-FSER-160–61 (explaining the "substantial evidentiary obstacles" to prove non-public data were shared without

consent).  And there was "a meaningful risk that the Class and counsel would ultimately receive nothing."  1-ER-16.

**3.  Amount.**  Facebook agreed to pay $725 million, "a highly favorable result for the Class."  1-ER-7.  The district court found that figure "provides significant monetary benefits to the Class" and represents "a substantial portion of the maximum monetary relief that the Class could realistically recover after a trial, post-trial motions, and an appeal."  1-ER-15.

**4.  Class's reaction.**  Class notice reached more than 93% of the 253 million members of the class, and the district court was "blown away by how many people made claims"—almost 29 million, with about 18 million of those validated by the settlement administrator as of the final approval hearing.  1-FSER-15.  And a vanishingly small fraction of the class opted out of or objected to the settlement.  1-FSER-54.

As the district court noted, 1-ER-5, the "'consideration of these . . . factors alone is not enough'" for a precertification settlement "to survive appellate review," because "Rule 23(e)(2) also requires the court to consider 'the terms of any proposed award of attorney's fees' and scrutinize the settlement for evidence of collusion or conflicts of interest

before approving the settlement as fair." *Kim v. Allison*, 8 F.4th 1170, 1179 (9th Cir. 2021). In evaluating whether there may have been collusion to sell out the class members, this Court looks for three "warning signs": "rever[sion]" (any unclaimed settlement funds or unawarded fees go back to the settling defendant); a "'clear sailing' agreement" (the settling defendant agrees not to oppose the plaintiffs' request for fees and costs); and a "disproportionate distribution of the settlement" to the plaintiffs' lawyers. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

None of those warning signs appears here. The agreement provides that no amount will revert to Facebook, and any unclaimed funds will go to other class members. 2-FSER-184 (¶ 49). There is also no clear-sailing agreement; instead, Facebook "reserve[d] the right to oppose" any fee request for any reason. 2-FSER-193 (¶ 82). And the class will receive about three-quarters of the $725 million fund. *See* 1-ER-15–16. That enormous recovery for class members makes this case quite unlike those in which the plaintiffs' lawyers proposed making off with nearly the entire monetary value of the settlement. In *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021), for example, this Court reversed a settlement-

29

approval order in part because the plaintiffs' lawyers would have "receive[d] seven times more money than the class members" and because the injunctive relief—a promise not to use a label that the defendant had already abandoned years before—was "worthless." *Id.* at 1018, 1020, 1028.

The district court expressly rejected any notion that there was "fraud or collusion underlying this Settlement," explaining that "it was reached as a result of extensive arm's length negotiations." 1-ER-5. That much was clear to the court from the hard work put in by two mediators (including a retired federal magistrate judge and a federal district court judge) to reach both an agreement in principle and a final settlement. 1-ER-5–6. The district court explained that in the usual case, the involvement of a mediator may or may not rule out any suspicion of collusion, but in this case, the court knew directly, from "communications with mediator Jay Gandhi, that his involvement was critical in brokering a fair settlement," "as opposed to simply trying to broker a[ny] settlement" at all. 1-ER-5–6.

Because the settlement satisfies this Court's test for fairness, reasonableness, and adequacy, and because there is no reason to think it

was the product of collusion, the district court did not abuse its discretion in approving the settlement.

## II.   The objectors' challenges to the settlement are meritless.

Because this settlement meets all the requirements for approval and has none of the flaws this Court has held require reversal, the objectors ask this Court to invent new standards for settlement approval. The objectors argue that: (A) settlements must always be measured against the theoretical maximum statutory damages, even if that figure, multiplied across thousands or millions of class members, would amount to an unconstitutional monetary penalty; (B) the allocation of settlement funds must reflect an accounting of the individual strengths and weaknesses of each class member's claims; and (C) the district court approved unreasonably high attorneys' fees for plaintiffs' counsel. The first two arguments are meritless. Facebook takes no position on the propriety of the attorneys' fees, but the settlement should be approved even if the Court concludes that a reduction in fees is warranted.

### A.   The district court did not abuse its discretion in overruling objections to the settlement relief.

The objectors primarily challenge the district court's evaluation of one *Hanlon* factor:  the amount of the settlement.  Opening Br. 11–19.

31

But the district court did not abuse its discretion in approving a $725 million settlement. 2-ER-118.

The district court found that the settlement provided "substantial benefits" for class members, especially given the "stage of the proceedings" (before summary judgment and class certification). 1-ER-6. Moreover, the district court recognized that plaintiffs faced "significant legal risks and potential difficulties of proof," including with respect to their statutory claim under the VPPA, if the litigation were to proceed. 1-ER-7. Although "the recovery theoretically available under the VPPA is very large," the district court explained, the risks of continued litigation were "reasonably accounted for" in the settlement. 1-ER-7. Ultimately, the settlement was a "highly favorable result for the Class." 1-ER-7.

Nevertheless, the objectors say $725 million isn't enough. In their view, the district court should have started by calculating the maximum hypothetical statutory damages—$2,500 in VPPA statutory damages and $1,000 in SCA statutory damages multiplied by 253 million class members, which equals $625 billion for the VPPA claim and $253 billion for the SCA claim ($878 billion total). Opening Br. 13, 18–19; *see*

2-ER-285–86. Then, the objectors say, the district court should have calculated 1% of that combined amount ($8.78 billion) and reflexively rejected any settlement below it. Opening Br. 19, 21–22; *see* 2-ER-288.

The district court did not abuse its discretion in rejecting these objections and approving the settlement for two reasons. First, this Court has already rejected Feldman and Mahaney's theoretical-value-calculation approach to deciding the merits of settlement approvals. Second, it would have been improper to use as a benchmark an $878 billion damages award that is both unconstitutional and speculative.

### 1. This Court has rejected the objectors' proposed approach to evaluating settlements.

The crux of the objectors' argument is that settlement approval must always pass a mathematical test. "As explained by the Seventh Circuit," they argue, the district court should have quantified the maximum potential recovery, multiplied that by the probability of success, and refused to approve a settlement for less than that "'net expected value.'" Opening Br. 20 (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002)).

But this Court has expressly disagreed with the Seventh Circuit's approach and repeatedly rejected identical attempts—including by

33

Feldman—to replace the parties' arm's-length negotiations and district courts' sound judgment with a rigid formula. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), this Court was "not persuaded" that district courts should "quantif[y] the expected value of fully litigating the matter" and compare that with the settlement amount; "our approach, and the factors we identify, are somewhat different" from those of the "Seventh Circuit." *Id.* at 965 (citing *Reynolds*, 288 F.3d at 284–85). Rather, this Court puts a "good deal of stock in the product of an arms-length, non-collusive, negotiated resolution," and has "never" done what the objectors ask the Court to do now—"prescrib[e] a particular formula by which that outcome must be tested." *Id.* Accordingly, this Court confirmed that district courts considering a settlement need not calculate maximum potential damages: Although "treble damages" are an "automatic component of the recovery of antitrust damages," for example, "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value." *Id.* at 964 (emphasis omitted) (citing 15 U.S.C. § 15(a)).

Three years after *Rodriguez*, this Court again "reject[ed]" objectors' assertions that district courts are "required to find a specific monetary

value corresponding to each of the plaintiff class's statutory claims and compare the value of those claims to the proffered settlement award." *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012). District courts should review the "fairness and adequacy of the overall settlement amount to the class as a whole," with "broad discretion" to approve settlements based on their firsthand experience with the case. *Id.* at 824 (emphasis omitted).

Most recently, in February, this Court once again held that a district court "properly rejected" Feldman's arguments that it "should have analyzed [a] settlement by aggregating statutory damages" and comparing the settlement to that benchmark. *In re Facebook, Inc. Internet Tracking Litig.*, 2024 WL 700985, at *1 (9th Cir. Feb. 21, 2024). That case and this one present—in Feldman's own words—the "identical issue." 1-FSER-17.

The objectors' challenge here fails for the same reasons. In *Facebook Internet Tracking*, Feldman, represented by the same counsel, asked this Court to reverse a $90 million settlement involving Wiretap Act claims against Facebook because that amount paled in comparison to the $1.24 *trillion* aggregated statutory damages award theoretically

available. 2024 WL 700985, at *1. There, as here, Feldman argued that district courts must calculate the "maximum potential recovery," multiply it by the chances of success, and refuse to approve any settlement below the resulting expected value. Feldman Br. 22–23, 2023 WL 3130603 (9th Cir. Apr. 19, 2023) (citing *Reynolds*, 288 F.3d at 284–85). This Court held that the "district court properly rejected" that objection. 2024 WL 700985, at *1.

That analysis should end the matter. As the objectors argued in their successful motion to stay briefing in this case, if "this Court affirms the district court ruling in [*Facebook Internet Tracking*], then the primary issue in the instant appeal would likely be eliminated" because the two cases present "the identical primary issue" regarding "how a district court should evaluate a class action settlement" that involves "release of individual statutory damage claims." No. 23-3550, Dkt. 4.1.

Objectors filed their brief two months after *Facebook Internet Tracking*, but they do not mention it, much less offer any reason the Court should reach a different result here. Opening Br. 16. In fact, the only difference between this case and Feldman's prior appeal is that the math has become *less favorable* to her position: The theoretical statutory

36

damages here are lower ($878 billion instead of $1.24 trillion), but the settlement is far larger ($725 million instead of $90 million).

There are good reasons why settlement negotiations—and approvals—are not reducible to mathematical formulas. When evaluating whether a "monetary portion of the settlement [is] inadequate," the parties should not "presuppose that plaintiffs prevail at the end of trial" because that would "undercu[t] the point of a negotiated resolution where defendants do not admit liability." *Rodriguez*, 563 F.3d at 964. Indeed, the "very essence of a settlement" is "'a yielding of absolutes and an abandoning of highest hopes.'" *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998). A district court's determination is therefore "nothing more than 'an amalgam of delicate balancing, gross approximations, and rough justice.'" *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

If district courts were required to calculate maximum potential damages in every case, plaintiffs would have the incentive to tack on dubious claims with potentially massive statutory damage amounts to every class-action complaint. And, in the face of claims carrying billions or even trillions of dollars in hypothetical statutory damages—no matter

how weak and even if disproved in discovery—parties would have difficulty negotiating a resolution that is fair, reasonable, and acceptable for both sides. Weak statutory claims with a miniscule potential for potentially large statutory damages would overwhelm the rest of the case.

This appeal highlights those concerns. The core of plaintiffs' case concerns how Facebook disclosed, permitted, and monitored sharing of user data with third-party app developers and partners. *See* 2-ER-28–32, 47–49. By contrast, the VPPA and SCA claims rested on strained statutory interpretations and thin allegations that were disproven in discovery, and the VPPA claim further concerned what user interactions other users could see, not the third-party data-sharing at the heart of the case. *See supra*, at 6–7. Under the objectors' view, the district judge would have to reject a favorable and fair settlement simply because it did not capture the theoretical value tied to far-fetched hypothetical recoveries.

In short, the objectors' key premises—that the district court must "'translate [its] intuitions'" into mathematical equations and was "bound to use" maximum statutory damages awards "when beginning its

evaluation of the proposed settlement," Opening Br. 18, 21—are contrary to Ninth Circuit law, which the objectors have given this Court no reason to revisit.

### 2. An $878 billion benchmark would be unreasonable and unconstitutional in any event.

The objectors calculate a total of $878 billion as plaintiffs' maximum potential recovery for the statutory claims at trial—$625 billion for the VPPA claim and $253 billion for the SCA claim—and insist that it is the only benchmark the district court should have used to judge the settlement. Opening Br. 13, 18–19; *see* 2-ER-285–86.

The first problem with that argument is that Feldman and Mahaney forfeited half of it. They never asked the district court to consider the SCA's statutory damages as a benchmark. Their objections discussed exclusively the VPPA's statutory damages. *See* 2-ER-285–92; 2-ER-285–86, 2-ER-288. Because "issues not raised before the district court are forfeited on appeal," *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022), this Court should disregard the objectors' invocation of the SCA claim's hypothetical value. *See* Opening Br. 19, 21.

What's more, there is no reason to think any court would have ever awarded an amount anywhere near the maximum statutory damages of

39

the VPPA and SCA claims, not least because doing so would violate due process. If an $878 billion judgment raises constitutional concerns, then it makes little sense to use it as a yardstick.

The district court could not have awarded anything close to $878 billion in statutory damages here. This Court has held that "aggregated statutory damages awards" are "subject to constitutional due process limitations." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1121 (9th Cir. 2022). Those limitations protect against aggregate statutory damages that "resul[t] in extraordinarily large awards wholly disproportionate to the goals of the statute." *Id.* at 1122. Wherever that bar is, $878 billion plainly surpasses it. A judgment that big would annihilate any company, including Facebook, which last reported annual net income of $39 billion. *See* Form 10-K at 60 (Feb. 2, 2024), https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=17229405. Even the objectors "concede[d]" that a "trial verdict for the full" amount of statutory damages "would be unlikely to be upheld" because of due-process concerns. 1-FSER-17.

This Court has confirmed that district courts need not measure a settlement award against an unconstitutional yardstick. In *Facebook*

40

*Internet Tracking*, for example, the district court approved a $90 million settlement and "properly rejected" Feldman's proposed "$1.24 trillion in statutory damages . . . as an unreasonable baseline that would violate due process." 2024 WL 700985, at *1. Likewise, in *Fraley v. Batman*, the district court approved a class settlement that "awarded $15 to each claiming class member, notwithstanding the possibility of a $750 statutory penalty"—and this Court affirmed, reasoning in part that "an award of $750 per claiming class member could implicate due process concerns." 638 F. App'x 594, 597 (9th Cir. 2016). Here, too, the objectors (and the district court) all agreed that awarding full statutory damages to each claiming class member would violate due process. 1-ER-7. The district court sensibly measured the settlement award's fairness and reasonableness on its own merits, rather than comparing it to a hypothetical award that due process would never allow. 1-ER-6.

These constitutional concerns are not the only problem. The objectors also incorrectly assume that plaintiffs' success on the VPPA and SCA claims would have resulted in maximum statutory damages awards for every single class member. But both statutes provide that district courts "may"—not must—award statutory damages. 18 U.S.C.

41

§§ 2710(c)(2) (VPPA), 2707(c) (SCA). Under other privacy-based statutes similarly providing that district courts "may" award statutory damages—like the Wiretap Act, *id.* § 2520(c)(2)—courts sometimes decline to award *any* damages under the statute. *E.g.*, *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 818–19 (11th Cir. 2004); *Dorris v. Absher*, 179 F.3d 420, 429 (6th Cir. 1999); *Nalley v. Nalley*, 53 F.3d 649, 651 (4th Cir. 1995).

Because statutory damages under the VPPA and the SCA must not be "less than" Congress's prescribed amount if they are awarded, 18 U.S.C. §§ 2710(c)(2) (VPPA), 2707(c) (SCA), a court would have to decide whether to award *all* available statutory damages and annihilate a company, or award *none*. The court could not pick a figure that falls between those two poles. It is far from certain that the district court here would have awarded *any* of these discretionary statutory damages even if plaintiffs had prevailed.

For this reason, where statutory damages are only a possibility, district courts need not assume their full measure would be awarded. *Lane*, 696 F.3d at 823. For instance, this Court in *Lane* concluded that the plaintiffs' entitlement to statutory damages under the VPPA was "speculative and contingent" because, just as here, it turned on questions

42

of fact and "novel legal theories." *Id.* Against the backdrop of that uncertainty, this Court held the $9.5 million settlement approved by the district court in *Lane* was "substantial," even if the "value of the plaintiffs' claims was in fact greater" than that number. *Id.* at 822, 824; *see also, e.g.*, *Dikeman v. Progressive Express Ins. Co.*, 312 F. App'x 168, 171 (11th Cir. 2008) (affirming settlement approval in part because plaintiff's entitlement to "statutory damages" was "seriously debatable and the [settlement agreement] reflects that uncertainty").

Here, the district court explained that plaintiffs' VPPA and SCA claims involved "significant legal risks and potential difficulties of proof." 1-ER-7; *see supra*, at 25–26 (describing the potential hurdles). As plaintiffs acknowledged, the VPPA claim presented "significant risks" if the case were to move forward. 2-ER-127; *see also* 1-FSER-33 (similar). And Facebook would have "serious" merits arguments under the SCA. 2-ER-132.

With that uncertainty, the district court did not abuse its discretion by approving the $725 million settlement amount, which it viewed as "substantial." 1-ER-6. This Court puts a "good deal of stock in the product of an arms-length" negotiation, *Rodriguez*, 563 F.3d at 965, and

43

the settlement amount here was hammered out through a year's worth of settlement negotiations guided by a mediator and a judge, *see supra*, at 8–9. And the return of about $30 on average per claiming class member, 1-FSER-15, is "substantial" in the class-action context, 1-ER-6; *accord Fraley*, 638 F. App'x at 597 (approving settlement that awarded "$15 to each claiming class member," notwithstanding the availability of a $750 statutory penalty).

The settlement approval should be affirmed.

## B. The settlement is allocated equitably.

The objectors also challenge the settlement's allocation among class members. The district court did not abuse its discretion in approving the allocation plan, which was a fair and reasonable means of rewarding class members based on the strength of their claims.

A plan for allocating settlement relief need only be "fair, reasonable, and adequate." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284–85 (9th Cir. 1992). The settlement should treat "class members equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D), so the "apportionment of relief among class members" should "take[] appropriate account of differences among their claims," Fed. R. Civ. P. 23(e)(2)(D) advisory

committee's notes to 2018 amendment. The "goal is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated." 4 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 13:56 (6th ed. 2024). If an allocation plan uses a "reasonable" and administrable methodology to assign greater recoveries to class members with more valuable claims, the district court is within its discretion to approve it. *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 780–82 (9th Cir. 2022).

The district court approved a settlement allocation plan that assigns class members "allocation points" for each month they had an active Facebook account, which correlates to the amount of money each claimant will ultimately be awarded. 1-ER-8. The parties agreed to this methodology because the length of time users were active on Facebook tracked the "probable extent" to which third parties had access to Facebook users' data. 1-ER-8. Class members who were active on Facebook longer, and who therefore may have more valuable claims, will receive a larger share of the settlement. Given the lack of any information that "might enable a more precise measure of third-party

45

access," the district court found that relying on the number of months users had an account is "a rational and fair basis" to allocate the settlement, and that the plan is "fair, reasonable, and adequate." 1-ER-8.

The objectors say the allocation plan treats some class members inequitably. According to the objectors, the district court ruled that Facebook's consent defense barred some claims for class members who joined Facebook after 2010, but the defense was "not available" for class members who joined Facebook before 2010. Opening Br. 23. Thus, users who joined before 2010 have "uniquely strong" claims that deserve a greater share of the settlement. Opening Br. 23. To account for these stronger claims, the objectors say, the allocation plan should award double credit for every month class members had a Facebook account before 2010. Opening Br. 25–26.

The district court was within its discretion to reject this objection and approve the allocation plan for two reasons. First, the objectors' argument is factually wrong: The district court did not decide that Facebook's consent defense applies only to users who joined in 2010 or later. Second, the allocation plan treats class members equitably by

46

applying a fair and administrable formula that accounts for the relative strength of class members' claims.

### 1. The objectors' challenge is factually wrong.

The objectors say that "pre-2010 users" have particularly strong claims because Facebook's consent defense was "not available" for claims brought by class members who joined Facebook "before or during 2009." Opening Br. 23. That is wrong. The district court held that Facebook's consent defense applied to users who joined in 2009 or later and did not rule out the applicability of the consent defense to users who joined before 2009.

Based on the documents incorporated by reference in the complaint, the district court found that Facebook disclosed its friend-sharing practices "around 2009." 2-ER-49. Therefore, in its dismissal order, the court held that only plaintiffs "who signed up *before* roughly *2009* may pursue claims based on" friend sharing. 2-ER-50 (emphasis added). Despite relying heavily on this ruling, objectors consistently misstate it, insisting that it applies to users who joined "prior to *2010*." Opening Br. 25 (emphasis added); *see also* 2-ER-291 n.6 (asserting, based on a 2018 *New York Times* article, that it "appears" the "actual date of the public

47

disclosure was in 2010, not 2009"). The objectors doubtless prefer that formulation because Feldman joined Facebook in 2009. Opening Br. 6. But that preference does not change the fact that the district court dismissed friend-sharing claims for all class members who joined Facebook in 2009 or later, reasoning that all such users consented to friend sharing.

At the pleadings stage, the district court declined to decide whether Facebook's consent defense barred the claims of users who joined before "roughly 2009" because it was limited to the complaint's allegations and judicially noticeable documents before it. But the district court made clear that Facebook could raise this defense "at a subsequent phase in the case." 2-ER-50 n.14.

In support of the motion for settlement approval, Facebook explained that it first disclosed friend sharing in 2007 in policies with language similar to the 2009 disclosures the court considered on Facebook's motion to dismiss. 1-ER-9; 1-FSER-160; *compare* 2-ER-88 (Facebook's 2012 Data Use Policy, which the court held disclosed friend sharing), *with, e.g.*, 1-FSER-87 (Facebook 2008 Privacy Policy). At the final approval hearing, plaintiffs also made clear that Facebook's consent

48

defense is far broader than the objectors' misreading of the partial dismissal order: "it's just not true that persons who signed up before 2009 won't face a consent defense." 1-FSER-35. Plaintiffs acknowledged that Facebook's earlier disclosures, which would have been filed alongside any motion for summary judgment, gave this defense "considerable force." 1-FSER-87.

In approving the settlement, the district court specifically rejected the objectors' characterization of its dismissal order, explaining that it had "merely ruled that [Facebook's] consent defense did not prevail as a matter of law given what was before the Court on [Facebook's] motion to dismiss," and that Facebook retained its ability to press that defense at summary judgment or trial. 1-ER-9.

Because Facebook's strong consent defense remained available against plaintiffs who joined Facebook before 2009, those users' claims are not "uniquely strong," much less twice as strong as other users' claims. Opening Br. 23. The objectors therefore lack any factual basis to assert the plan of allocation treats them inequitably.

49

### 2. The allocation plan is fair, reasonable, and adequate.

Even if the objectors were right on the facts, it would make no difference because the district court was well within its discretion to find the allocation plan treats class members equitably. Rule 23(e)(2)(D) is a "flexible standard" that "allows for the unequal distribution of settlement funds so long as the distribution formula takes account of legitimate considerations" in the differences between class members' claims and is ultimately "fair, reasonable, and adequate." *Radcliffe v. Hernandez*, 794 F. App'x 605, 607–08 (9th Cir. 2019) (affirming approval of settlement over objection to allocation plan). For that reason, this Court routinely declines to supplant the judgment of the district court where there is a reasonable, administrable plan to distribute the settlement among the class members according to the strength of their claims.

In *Apple*, for example, this Court confronted an allocation plan awarding money only to those class members who could attest they had suffered some injury. 50 F.4th at 781. The district court approved treating class members differently—awarding damages to some and none to others—because the plaintiffs' claims all required a showing of damages. *Id.* Feldman objected to that settlement, too, arguing that this

50

result was inequitable.  The district court overruled Feldman's objection, and this Court affirmed.  The allocation plan treated class members equitably because it awarded money that reflected the value of the claims, and it was fair to award nothing to class members with "valueless" claims.  *Id.*

Similarly, this Court has affirmed a settlement allocating relief in a labor dispute according to the "number of shifts worked" during the class period.  *Kang v. Fyson*, 2022 WL 6943174, at *3 (9th Cir. Oct. 12, 2022).  The objectors there argued that this allocation was unfair for class members who earned the most in commissions.  *Id.*  The plaintiffs, for their part, argued that including commission payments would have required a "painstakingly detailed damages analysis," and that using the number of shifts was a reasonable way to divvy up the settlement.  Pls.' Answering Br. at 42, *Kang v. Fyson*, 2022 WL 4101097 (9th Cir. Aug. 31, 2022).  This Court affirmed, holding that using the number of shifts as a proxy for the value of class members' claims was "a simple, efficient, and reasonable way of allocating damages."  2022 WL 6943174, at *3.

Here, too, the allocation plan distributes the settlement based on a "simple, efficient, and reasonable" metric:  the number of months a

51

claimant was on Facebook. *Kang*, 2022 WL 6943174, at *3. The plan did not need to account for every last reason why some class members might have had stronger claims than others. Nor could it, given the complexity of this case, the dozens of claims asserted by the plaintiffs, and the scores of defenses raised by Facebook.

What's more, that allocation plan's time-centric approach accounts for the very thing that the objectors say is missing: a "greater share of [the] settlement recovery" to those who signed up for Facebook before 2010. Opening Br. 24; *see also* 2-ER-292. Users who, like the objectors, signed up for Facebook before 2010 will receive credit for those months, whereas users who signed up after 2010 will not get credit for those months. 1-ER-8.

The objectors' theory boils down to an argument that the settlement and district court addressed their concern but did not do so in the way they prefer. Yet second-guessing those sorts of discretionary determinations is not this Court's role: "Settlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. It is enough that the district

52

court approved a sensible and administrable distribution plan, under which time on the Facebook platform served as a proxy for the extent to which each class member's data were shared—and therefore the value of that class member's claims. This plan is administrable and can be implemented through a simple and efficient "pro rata calculation." *Kang*, 2022 WL 6943174, at *3.

Finally, there is little reason to think that plaintiffs undervalued the claims of those who joined Facebook before 2010 in agreeing to the settlement. Six of the eight class representatives joined Facebook before that time.[1] That several named plaintiffs who also joined before 2010 concluded that the per-month credit plan of allocation adequately accounted for *their* claims "undermines" the objectors' suggestion that post-2010 users sold out pre-2009 users, and confirms that the "district court did not abuse its discretion in rejecting [the] objections to the plan of allocation." *Glass v. UBS Fin. Servs., Inc.*, 331 F. App'x 452, 455 (9th

---

[1] *See* 2-FSER-320 (Akins Decl. ¶ 3) (joined in 2008); 2-FSER-327 (Ariciu Decl. ¶ 3) (joined in 2005); 2-FSER-334 (Bell Decl. ¶ 3) (joined in 2010); 2-FSER-341 (Burk Decl. ¶ 3) (joined in 2006); 2-FSER-348 (Fischer Decl. ¶ 3) (joined in 2013); 2-FSER-355 (King Decl. ¶ 3) (joined in 2008); 2-FSER-362 (O'Hara Decl. ¶ 3) (joined in 2007); 2-FSER-369 (Senko Decl. ¶ 3) (joined in 2005).

Cir. 2009) (rejecting challenge to settlement allocation where class representatives were similarly situated to objector); *see also Hanlon*, 150 F.3d at 1021, 1027 (affirming allocation of settlement where class representatives included those in other potential subclasses, and finding "no disparate treatment" in allocation of settlement among class members, who "all stood to benefit equally"); *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1101 (11th Cir. 2023) (affirming allocation plan where "class representatives share the same interests as absent class members, assert . . . substantially similar claims stemming from a common event, and share the same kinds of injuries").

Plaintiffs appropriately protected their own interests, and those of other class members, by tying settlement payments to the number of months a user was on Facebook. The district court, which was familiar with how the value of class member's claims may vary, was well within its discretion to find that this allocation plan accounted for that variation equitably.

## C. The district court's award of attorneys' fees is not a basis for reversal of the settlement approval.

Plaintiffs' counsel sought and received approval for $181 million, or 25% of the settlement fund. 1-ER-10, 1-ER-15. Facebook takes no

54

position on the objectors' challenge to the amount of attorneys' fees awarded. Opening Br. 26–32. No matter how the Court resolves that challenge, it should affirm the settlement for two reasons.

*First*, the settlement agreement states that if a court "declines to approve" attorneys' fees, "all remaining provisions in th[e] Settlement Agreement shall remain in full force and effect." 2-FSER-202–03 (¶ 122); *see also* 2-FSER-194 (¶ 85) (noting that the parties "did not discuss" attorneys' fees in settlement negotiations).

This Court and other courts of appeals have relied on similar language to affirm settlement approvals even after vacating fee awards. When the "parties' settlement agreement expressly does not depend on approval of the fee award," it is "unnecessary to reverse the entire settlement approval in conjunction with our vacatur of the fee award." *In re Easysaver Rewards Litig.*, 906 F.3d 747, 762 (9th Cir. 2018). So where, as here, the "settlement agreement in th[e] case specifically separated the approval of fees from the rest of the settlement," the district court's "approval of the settlement can otherwise stand." *Russell v. Kohl's Dep't Stores, Inc.*, 755 F. App'x 605, 609 (9th Cir. 2018); *accord, e.g.*, *In re Lumber Liquidators Chinese-Manufactured Flooring Prods.*

55

*Mktg., Sales Pracs. & Prods. Liab. Litig.*, 952 F.3d 471, 492 (4th Cir. 2020) (when "the validity of the settlement agreement has not been made contingent on our approval of the Attorney's Fees Order," the approval order "survives" vacatur of attorneys' fees).

*Second*, there is no reason to think the class members would have reacted differently to the settlement had they known of a possible remand on the fees award. The district court awarded 25% of the settlement fund to plaintiffs' attorneys. 1-ER-15. This is a common-fund settlement, and it is expressly non-reversionary, 2-FSER-198 (¶ 104), so the class would receive the difference if the amount of attorneys' fees is reduced. Accordingly, the Court should "affirm approval of the settlement" regardless of whether it approves the award of attorneys' fees. *Rodriguez*, 563 F.3d at 968–69 (affirming settlement approval while vacating and remanding award of attorneys' fees); *see also Easysaver*, 906 F.3d at 762; *Lumber Liquidators*, 952 F.3d at 492.

## CONCLUSION

Earlier this year, this Court rejected an identical challenge by Feldman to another class settlement involving Facebook. Feldman offers no basis to reach a different result here, and this Court should affirm the district court's approval of the settlement.

Dated: August 19, 2024

Respectfully submitted,

/s/ *Joshua S. Lipshutz*
Joshua S. Lipshutz

*Counsel for Facebook, Inc.*

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Facebook, Inc. states that it is not aware of any related cases pending before this Court.  The parties to the earlier consolidated case, No. 23-3623, joined in a stipulated motion to voluntarily dismiss that appeal, which was granted on June 24, 2024.


Dated: August 19, 2024 　　　　　　 */s/ Joshua S. Lipshutz*_____
　　　　　　　　　　　　　　　　 Joshua S. Lipshutz

　　　　　　　　　　　　　　　　 *Counsel for Facebook, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that under Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-1(a), this answering brief is proportionately spaced, has a typeface of 14 points, and contains 10,884 words, excluding the portions excepted by Federal Rule of Appellate Procedure 32(f).

Dated: August 19, 2024          _/s/ Joshua S. Lipshutz_
                                      Joshua S. Lipshutz

                                      _Counsel for Facebook, Inc._